55 Cal.Rptr.3d 34 (2007)
147 Cal.App.4th 1001
LANDWATCH MONTEREY COUNTY, Plaintiff and Appellant,
v.
COUNTY OF MONTEREY et al., Defendants and Respondents;
Don Chapin et al., Real Parties in Interest and Respondents.
No. H028659.
Court of Appeal of California, Sixth District.
January 23, 2007.
*37 William P. Parkin, Jonathan Wittwer, Sandra Handley, Wittwer & Parkin, Santa Cruz, CA, for Plaintiff and Appellant.
Charles J. McKee, City Counsel, Efren N. Iglesia, Senior Deputy County Counsel,
Salinas, CA, for Defendants and Respondents The City of Palo Alto et al.
John S. Bridges, Mark A. Cameron, David C. Sweigert, Fenton & Keller, Monterey, CA, for Real Parties in Interest and Respondents Don Chapin et al.
RUSHING, P.J.

Statement of the Case
In this case, Landwatch Monterey County (Landwatch) claims that the approval of a subdivision project with a mitigated negative declaration (MND) violates the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1]
On May 4, 2004, the Monterey County Board of Supervisors (Board) approved the Cathrein Estates Subdivision and Combined Development Project (Project) and adopted a MND. Landwatch challenged the Board's decision in a petition to the superior court for a writ of mandate. Landwatch claimed the Project posed potentially significant adverse environmental impacts that required the preparation of an environmental impact report (EIR). The trial court denied the petition. Landwatch now appeals from the judgment.
Landwatch renews its claim, arguing that approving the Project with an MND, instead of preparing and EIR, violates CEQA because the Project may have an adverse impact: It may contribute to a severe groundwater overdraft in North Monterey County. Landwatch also claims that the Project violates the Monterey County General Plan and the North County Area Plan.
We affirm the judgment.

*38 Background[2]
In June 1999, real parties in interest Donald Chapin, Jr., and Barbara Chapin (the Chapins) filed an application for the Project, which is located in the Prunedale area of North Monterey County. The Project comprises a 28-lot subdivision on a 143 acre parcel and use permits for grading, connection to a mutual water system, and the removal of trees.[3]

Water Supply
North Monterey County has two primary watersheds, the Pajaro River and the Salinas River, which, respectively, channel water into the Pajaro and Salinas sub-basins. The Pajaro sub-basin is subdivided into three sub-areas: Pajaro, Springfield Terrace, and Highlands North. The Salinas sub-basin is divided into two sub-areas: Highlands South and Granite Ridge. The geographic delineation of sub-areas is based on both jurisdictional considerations and geological characteristics.
Since 1952, several studies of the North Monterey County groundwater supply have revealed a significant, area-wide overdraft of groundwater.[4] All sub-areas are in states of overdraft and require either a reduction in demand or a supplemental supply, but the severity of the overdraft in each sub-area varies due to the particular mix of uses and underlying geology. Accordingly, the immediacy of the overdraft problem in each sub-area and the types of short-term and/or long term solutions needed to address it also vary.[5]
The Project is located at the southern border of the Granite Ridge sub-area, which is eponymously named after a granite ridge shelf that runs from north to south but drops off as it moves south. Prior studies indicated that this sub-area is reaching its "sustainable supply" of water. Generally, the granite shelf limits storage capacity because water can collect only in granite cracks and fissures rather than in the more porous alluvial sand and gravel found in other sub-areas. Storage is further limited by the flow of subsurface groundwater down grade into adjacent sub-areas. The most recent study indicated that the Granite Ridge sub-area has a sustainable yield of 610 acre-feet per year, current demand of 1,310 acre-feet, and an overdraft of 700 acre-feet.

The Initial Study
The Chapins and their engineering consultants met with staff from the Monterey-County Planning and Building Inspection
*39 Department (Planning Department) for several months before formally filing their application to address potential water issues. They then submitted technical studies about hydrological impacts, along with their application, which was deemed complete in August 1999. Thereafter, the Chapins submitted additional hydrological test results and analyses.
In April 2000, the Planning Department prepared a preliminary draft of the initial study for the Project. In May 2000, after receiving additional data about the well source of water for the Project, the Monterey County Department of Health (Department of Health) found that there was adequate quantity and quality of water for the Project.
In June 2000, the Planning Department revised the preliminary draft. It stated that the Project would obtain water service by connecting to a well that was part of the Hidden Canyon Ranch Mutual Water System on the adjoining property. The revised draft also noted that the Department of Health had determined that the system will have adequate quantity and quality to satisfy regulatory requirements.
The revised draft calculated that the Project would generate an additional net groundwater demand of 10.2 acre-feet per year, which, if not mitigated, would contribute to the overdraft and pose potentially significant individual and cumulative adverse hydrological impacts. However, the revised draft stated that the Project was designed to channel storm runoff through drains into large detention ponds that would augment existing on-site wetland habitat and prevent any increase in the peak flow discharge off-site. Moreover, the ponds would drain through underground percolation pits and recharge the local aquifer, offsetting the projected net overdraft. The percolation/recharge figures were based on testing and technical reports provided by LandSet Engineers, Inc. (LandSet). The revised draft further stated that the Project was subject to an ordinance requiring payment of a water impact fee, which would provide additional mitigation.[6] The revised draft recommended that an MND be prepared, rather than an EIR.
The revised draft generated many responses and criticisms, further meetings, and additional technical studies and reports that focused on numerous issues, including net water demand and the projected recharge rate from the detention ponds.
On July 17, 2000, Jerry LeMoine, an Environmental Health Specialist at the Department of Health, wrote to LandSet and challenged the technical information it had provided. LeMoine noted that the percolation calculations were based on an average of the tests conducted throughout the site. However, he pointed out that no test was conducted within 300 feet of a proposed detention pond. He further opined that the tests may not represent what may be taking place below the detention ponds because the tests were conducted at relatively shallow depths in permeable soil, and the fast percolation rates may simply reflect water flowing downslope over underlying cemented sand or duropan. *40 LeMoine opined that it was advisable to prepare "project specific hydrogeologic report. . . ."
In January 2001, LandSet conducted new percolation tests at the sites where the three proposed detention ponds were to be located. In February 2001, Geoconsultants, Inc. (Geoconsultants) prepared a "Comprehensive Groundwater Assessment Report" (CGA Report), which incorporated the results of LandSet's additional percolation tests.
The CGA Report explained that the location of the Project in the southwest portion of the sub-area and the relatively great depth to the granite there make the hydrogeologic conditions more similar to those in the adjacent Highlands South sub-area to the west than to those in the northern part of the Granite Ridge sub-area. "The primary aquifer unit underlying the site and vicinity is the Aromas Sand, which consists of weakly cemented brown and red sand and silty sand with local fine gravel. Well logs and other related information in the area suggest that the Aromas Sand is about 300 to 500 feet thick, overlying clay and sand and the older Purisima Formation, which in turn overlie buried granitic basement rocks of the southwest flank of the `granite ridge'."
In discussing water infiltration and percolation, the CGA Report stated that "[i]n the latest study, which was completed from January 17 through 20, 2001, exploratory borings and percolation tests were taken in the three proposed detention/recharge ponds. . . Based on the percolation tests . . . an average percolation rate of 1 to 2 inches per hour was determined for pond areas 1 and 3, which are located over silty and clayey sand in the shallow subsurface. Extremely rapid percolation rates of 9 to 18 inches per hour were noted for materials in pond area 2, which is located over a `clean' poorly graded sand in the shallow subsurface."
In discussing water supply, the CGA Report noted that a well drilled on the site in 1991 produced 37 gallons per minute during an eight-hour test period, with the water level dropping from 226 feet to 237 feet after 90 minutes, where it remained for the rest of the test period. Within 15 minutes after the test, water returned to the initial level. A second well in the adjacent Hidden Canyon Ranch was drilled in 1996. It yielded 53 gallons per minute for a 10-hour test period, with the water level dropping from 303 to 313 feet after 60 minutes, where it remained during the rest of the test period.
The CGA Report concluded there is more than enough water available from the on-site well alone to meet the Project's needs at buildout. It further concluded that with mitigation from retention/recharge ponds, the Project would not contribute, and may improve, overdraft problems in the sub-area. Accordingly, the CGA Report recommended that the Project incorporate the three ponds to be located in the site's major drainage areas and designed to contain an estimated two to four acre-feet of water.
On March 17, 2001, LeMoine wrote to the Planning Department. He acknowledged that he was not technically qualified to review the CGA Report but nevertheless called it a "hoax" that "any astute 8th grader could see through. . . ."
On March 21, 2001, LeMoine expanded on his view in an e-mail to Steven Maki of the Planning Department, who was in charge of the Project. He asserted that the conclusions in the CGA Report were not supported by the data from LandSet. In particular, LeMoine opined that net demand from the Project may be closer to 15 than 10.2 acre-feet per year. He thought the new detention pond tests were *41 too shallow and speculated that the faster percolation rates may simply reflect water draining down the side wall of the test hole. He also opined that water encountered in a deeper test hole suggested that there was a poor recharge rate in the area. LeMoine admitted that he was not a licensed engineer or hydrologist but said his views were based on 20 years of field experience with the Department of Environmental Health. He opposed a negative declaration.
On March 27, 2001, LeMoine wrote to Maki again. He reiterated his opinion concerning the data provided by LandSet. However, he stated that "the bottom line is that I am not technically qualified to evaluate that report any deeper than I did and some on either side of the project may question even that, whether I was in agreement with the report or disagreement with it. There is no point in me going any further with it." However, he thought that a focused EIR for water may be prudent and appropriate.
Later on April 26, 2001, LeMoine informed Maki that his department had declined to comment on proof of a long term water supply and balance for the Project. He referred Maki to the Water Resources Agency "for official evaluation" of the CGA Report. LeMoine further advised Maki that "my previous response to you . . . is unofficial and probably should not be included as part of the file."
On May 17, 2001, Geoconsultants produced an additional report in response to LeMoine's comments and criticisms. The new report confirmed the calculations and reiterated the previous information about net water demand, percolation rates, and the feasibility of recharge through detention ponds. The new report again concluded that the recharge system would mitigate the Project's net water use to the point where the impact, if any, on the groundwater resources in the sub-area will be less than significant. Moreover, during wet years, the mitigation system may return more water than is used, resulting in a net positive contribution to and beneficial impact on the water supply.
Geoconsultants later met with the Water Resources Agency to review the percolation/recharge data and reconfirmed the test results and analyses, which were based on the location of the Project in a "transitional" area between Granite Ridge and Highlands South, the lack of granitic basement at the existing well depth of 620 feet, and the percolation and recharge figures provided by LandSet.
Given all of this material and information, Maki and the planning staff revised the draft. In October 2001, Maki formally submitted and circulated the initial study. It reiterated all of the information in the June 2000 revised draft, including the source of water supply, the adequacy of the supply, and the channeling and storage of storm runoff into existing wetland habitat and detention/recharge ponds. The initial study also reiterated that the Project would generate 10.2 acre-feet of additional demand that, without mitigation, could exacerbate the overdraft problems in North Monterey County and the Granite Ridge sub-area and cause significant impacts to groundwater supplies and recharge capacity. However, unlike the June 2000 draft, the formal initial study stated that in light of the technical studies and tests, the additional demand of 10.2 acre-feet would be offset "by domestic water returns to the ground of 11.2 af/yr and a proposal to recharge groundwater by percolation pits in the bottom of retention and detention ponds." Quoting the CGA Report, the Initial Study stated that "`calculations by [LandSet] indicate that the predevelopment runoff, using an average of 18 inches of rainfall (Rantz, 1971) would *42 be 57.5 af/hr. With development, and the addition of impervious surfaces, runoff is estimated to be 69.0-57.5 that if percolated in the detention/recharge facilities would offset (or even make a slight positive contribution) the net project water demand of 11.2 af/yr' (Reference 30)." The initial study noted, however, that the County had not `Verified/certified the amount of recharge reported in the consultant's findings" by conducting independent tests. The initial study further stated that the payment of the requisite water impact fee would also help mitigate potentially significant impacts. In this regard, the initial study pointed out that the impact fees had helped fund the CWRM Plan, which was due to be completed in 2002.[7] The initial study recommended that approval of the Project with an MND, which was prepared and filed October 10, 2001.
During the next several months, the initial study and MND generated additional responses.[8]
In December 2003, the initial study was again revised and recirculated. The analysis and discussion of hydrological impacts remained the same. The revised initial study again concluded that with mitigation, the Project would not have significant adverse environmental impacts, and it recommended an MND.

Administrative and Judicial Hearings
On January 29, 2004, the Monterey County Standard Subdivision Committee held a hearing on the Project and agreed with the initial study that with mitigation, the Project would have no significant adverse impacts on the environment. Accordingly, it recommended that the Planning Commission adopt the revised initial study and the MND.[9]
On February 25, 2004, the Monterey County Planning Commission (Planning Commission) held a hearing. Before the hearing, it received letters and email in opposition to the Project, including letters from Landwatch and a neighboring property owner named Doug Kasunich.
In its letter, Landwatch argued that the Project required an EIR, noting that an EIR was being prepared for a similar project in North Monterey County. Landwatch claimed that an EIR was necessary because the net water demand from the Project could have an adverse environmental impact. Landwatch also claimed the Project is inconsistent with the Monterey County policy of requiring proof of a sustainable water supply  i.e., that it does not generate an additional demand for water than cannot be assured  because the Project will contribute 10.2 acre-feet to the North Monterey County overdraft. Landwatch opined that "`runoff calculations contained in the staff report . . . do not obviate the problem." Last, Landwatch claimed that the Project is inconsistent with the Monterey County General Plan.
Kasunich, who has lived in the area since 1981, owns an environmental drilling, testing, and sampling company and also operates a water well maintenance and repair service. In his letter, he stated that homes at the end of Pesante Road, which borders the Project, have always had problems *43 with water quantity and quality. He noted that nearby wells on Wild Pony-Way, the east end of Pesante Road, and Crazy Horse Canyon are contaminated with bacteria and arsenic.
He stated that the 80-foot well on his property used to produce 45 gallons of water per minute but currently yields only two gallons and constantly "sucks dry." The adjoining 180-foot well cannot produce enough water to keep a pump in it. One house in the area is on its fourth well, and every 10 years the owner has to dig deeper because of the declining water table. He observed that a subdivision near King Road has two large passive recharge ponds, but the well for the subdivision no longer produces sufficient water on site. A large subdivision near Coker Road has a pond that captured runoff from pavement. A rain gauge near the pond showed only one inch of rain during the previous months of October and November, which filled the pond to its maximum depth of 15 inches. However, the water stood there for two months without percolation. As a result, the rain that came in December flowed down Pesante Creek.
Kasunich noted that the agricultural use closest to the Project is having problems with nitrates in the deep aquifer. A 500-foot well on Holly Hills Road had no nitrate problem when drilled in 1978, but now showed significant nitrate intrusion from nearby septic systems.
Kasunich explained that his observations are based on 20 years of local work in ground water and related environmental fields and are intended to counter "the optimistic information your panel generally receives from a [Project's] consultants." He opined that many projects had been approved after the applicant made similar water balance claims "but none has ever been asked to demonstrate that the mitigation measures proposed actually work."
Rather, in his experience, recharge ponds may not percolate and prevent deep wells from losing productive capacity. He opined that the claims of passive groundwater recharge systems are "unrealistic." He notes that even though the area receives around 18 inches of rain, Pesante Creek often runs for as long as three months, indicating that the ground is saturated. Yet, the 180-foot well at Holly Hills Road remains almost dry. According to Kasunich, this reveals that the Aromas Sand formation at depth has low transmission rates so it could take hundreds of years to see surface recharge reach deeper aquifers.
Another speaker at the hearing was Ms. Lawrence, who represented the Health Department. She stated that there was sufficient water from the system to sustain the Project and noted that there had not been a drop in the well production since the pump tests were performed. Lawrence also noted that although the Project is within the Granite Ridge sub-area, the demarcation between sub-areas gets "fuzzy" the farther south one goes. At the same time, the granite shelf, characteristic of the Granite Ridge sub-area, comes down and drops off the farther south one goes, and therefore, the geology underneath different locations within a sub-area can be different. Thus, "[a]s you go further north in that sub-area, we see and have had pronounced problems with production capacity in wells and having wells go dry, but that's a lot further north into the Granite Ridge sub-area, more up along Crazy Horse and 101." Given the geology of the wells and their construction, the Project site area is "closer to what is consistent with the Salinas Valley area because I'm not seeing, based on production of the wells and also looking at the well logs themselves, what the wells are developed in, I'm not seeing that it's consistent with *44 what we see further north in the Granite Ridge sub-area."
After the hearing, the Planning Commission approved the; Project with an MND, subject to all of the conditions recommended in the revised initial study. A notice of determination was filed on February 27, 2004.
On March 19, 2004, Landwatch appealed the decision to the Board. On May 4, 2004, the Board held a public hearing. The Board had before it the voluminous administrative record, a detailed critique by Landwatch of the findings by the Planning Commission, the Chapins' response to the critique, planning staffs response, and Landwatch's reply. The Board also heard from several speakers, including proponents and opponents of the Project, who reiterated much of the same information and offered the same views and opinions presented to the Planning Commission.
In particular, the Board questioned the head of the Water Resources Agency, Curtis Weeks, concerning whether there was adequate water for the Project. He said that there was. He also stated that the Project is located in the alluvial fan coming out of the Gavilan Mountain Range. Lawrence also reiterated her previous statements to the Planning Commission that the wells serving the Project are not typical hard granite wells found in the northern part of the sub-area; rather, the wells penetrate through more clay and sand, which is typical of alluvial soil.
The Board questioned Lawrence about the water impact fee as mitigation. She noted that it is a standard condition for mitigation. She explained that the water impact fees had been earmarked and used for studies. However, after the studies were completed, the fees were being applied to implement the Salinas Valley Water Project (SVWP), which is a project of the Water Resources Agency involving various infrastructure improvements designed to halt the intrusion of seawater into the Salinas groundwater basin, promote additional recharge to the basin, and thereby protect and increase the long-term groundwater supply.
At the close of the hearing, the Board voted in favor of the Project and adopted Resolution No. 04-151, denying the appeal of Landwatch and approving the Project with an MND subject to the conditions and mitigation measures outlined and recommended by the Planning Commission. Among other things, the Board determined that the Project "conforms with the plans, policies, requirements and standards of the Monterey County Subdivision Ordinance (Title 19), the General Plan, North County Area Plan, and Monterey County Zoning Ordinance (Title 21)."
Landwatch challenged the Board's decision by filing a petition for a writ of mandate below. The trial court found no substantial evidence to support fair argument that the Project would pose adverse environmental impacts and denied the petition. Landwatch now appeals from the judgment.

Adoption of a Mitigated Negative Declaration
Landwatch contends that because North Monterey County has an indeniable water crisis, the Project obviously and necessarily will have significant adverse environmental impacts on the water supply. Therefore, approving the Project with an MND instead of an EIR violates CEQA.

Applicable Principles
Generally, an EIR must be prepared whenever "there is substantial evidence, in light of the whole record before the lead agency, that a nonexempt project may have a significant effect on the environment," *45 that is, "a substantial, or potentially substantial, adverse change in the environment." (§§ 21068, 21082.2; Guidelines, § 15382; see § 21082.2, subd. (a).) However, "CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial evidence that the project may have a significant effect on the environment." (San Bernardino Valley Audubon Society v. Metropolitan Water Dist. (1999) 71 Cal.App.4th 382, 389-390, 83 Cal.Rptr.2d 836, citing Guidelines, § 15070, subd (a); see also §§ 21064, 21080, subd. (c).)
Under CEQA, the lead agency  i.e., the public authority principally responsible for approving a project  prepares a preliminary environmental analysis of the proposed project called an initial study. (§ 21067; Guidelines, §§ 15063, subd. (a), 15365, 15367.) The initial study provides the lead agency "with information to use as the basis for deciding whether to prepare an EIR or negative declaration"; it permits "an applicant or lead agency to modify a project, mitigating adverse impacts before an EIR is prepared, thereby enabling the project to qualify for a negative declaration"; and it provides "documentation of the factual basis for the finding in a negative declaration that a project will not have a significant effect on the environment. . . ." (Guidelines, § 15063, subd. (c)(1), (c)(2), (c)(5).) Thus, one of the purposes of an initial study is to avoid the preparation of unnecessary EIRs. (Guidelines, § 15063, subd. (c)(6); Architectural Heritage Association v. County of Monterey (2004) 122 Cal.App.4th 1095, 1101, 19 Cal.Rptr.3d 469 (Architectural Heritage).)
In certain situations where a straightforward negative declaration is not appropriate, the lead agency may permit use of an MND. (§ 21064.5.) "If the initial study identifies potentially significant effects on the environment but revisions in the project plans `would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur' and there is no substantial evidence that the project as revised may have a significant effect on the environment, a mitigated negative declaration may be used." (San Bernardino Valley Audubon Society v. Metropolitan Water Dist, supra, 71 Cal.App.4th at p. 390, 88 Cal.Rptr.2d 836; see Guidelines, § 15064, subd. (f)(2).)
On appeal, Landwatch bears the burden to "demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impacts. [Citations.]" (League for Protection of Oakland's etc. Historic Resources v. City of Oakland, supra, 52 Cal.App.4th at p. 904, 60 Cal. Rptr.2d 821; see Laurel Heights Improvement Assn. v. Regents of University of California (1993) 6 Cal.4th 1112, 1123, 26 Cal.Rptr.2d 231, 864 P.2d 502; Architectural Heritage, supra, 122 Cal.App.4th at p. 1109, 19 Cal.Rptr.3d 469; Guidelines, § 15064, subd. (f)(1).) We determine whether a fair argument can be made by examining the entire record. (Leonoff v. Monterey County Bd. of Supervisors (1990) 222 Cal.App.3d 1337, 1348, 272 Cal. Rptr. 372.)
Whether there is substantial evidence to support fair argument is a question of law. (League for Protection of Oakland's etc. Historic Resources v. City of Oakland (1997) 52 Cal.App.4th 896, 905, 60 Cal.Rptr.2d 821.) "`In the CEQA context, substantial evidence is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached."'" (Leonoff v. Monterey County Bd. of Supervisors, supra, 222 Cal.App.3d *46 at p. 1348, 272 Cal.Rptr. 372.) "Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (§ 21082.2, subd. (c); Guidelines, § 15384, subd. (b).)

Adverse Impact on the Groundwater Supply
Landwatch claims there is substantial evidence to support fair argument that the Project may adversely impact the groundwater supply.
In support of this claim, it cites undisputed evidence of an overdraft in North Monterey County, including the Granite Ridge sub-area. It cites an October 2000 memorandum from the Director of Environmental Health to the Planning Commission, which notes that under County policy, new development that generates water demand in excess of the safe yield should be phased in and allowed only when additional water supplies are secured. The memorandum then generally states that "it is the position of the Environmental Health Department that it is not possible to support a finding of a long-term water supply for development in an area of significant, chronic overdraft. Further it is not prudent to place additional citizens at risk by allowing residential development in an overdraft area even when the development demonstrates water savings over previous use."
Landwatch next cites a July 2000 advisory memorandum from the Monterey County Environmental Resources Policy Division to Planning Department. It directed staff to advise all subdivision applicants in North Monterey County that "a focused EIR might be required for a project due to potentially significant cumulative impacts to water quantity and quality in that area" and "a subdivision project may be denied because of these conditions." (Underscoring in original.) The memorandum explained that current demand will exceed the average recharge by 100 percent. Also nitrate contamination levels are also increasing. For these reasons, the memorandum concluded, "ANY subdivision in this area, which would intensify water use, has the potential to result in a significant cumulative, as well as a project specific, impact to water quality and quantity." Accordingly, any initial study for a subdivision in the area must "state that the project will result in a significant cumulative effect on water quality and supply."
To guide staff, the memorandum attached purported excerpts from the initial study prepared for the Project. One excerpt states, "The applicant proposes to recharge groundwater by percolation pits in the bottom of retention and detention ponds . . ., but this will not reduce cumulative impacts to a level of insignificance." (Italics added.)[10]
Landwatch also cites LeMoine's March 27, 2001 e-mail to Maki, in which he reiterated his views concerning the data from LandSet and opined that it "may be appropriate and prudent to recommend a focused EIR for water" concerning the Project. (Italics added.)
The broad, generalized evidence cited by Landwatch reflects the existence of a general overdraft, concern about it, and the need to scrutinize future projects. Viewed in isolation, the evidence suggests that in the absence of additional water supplies, any new development, including *47 the Project, may contribute to the overdraft, and therefore a focused EIR on water should be prepared. However, in determining whether substantial evidence supports fair argument, "[t]he court does not look only to the evidence relied upon by appellants to the exclusion of all contrary evidence. Evidence that rebuts, contradicts or diminishes the reliability or credibility of appellants' evidence is properly considered. The absence of supporting evidence is properly considered. [¶] 'Because our focus is on the fair argument [issue], we must assess both the evidence in favor of the significant environmental impact and the evidence to the contrary  only then can we properly decide if the agency's conclusion regarding the fair argument question is supported by substantial evidence in light of the whole record. [Citation.]' [Citations.]." (Citizens' Committee To Save Our Village v. City of Claremont (1995) 37 Cal.App.4th 1157, 1168, 44 Cal.Rptr.2d 288.)
None of the pieces of evidence cited by Landwatch, except the e-mail from LeMoine, discusses the technical information, including well and percolation tests, concerning the adequacy of the water source for the Project and the projected performance of the detention/recharge mitigation system. Indeed, the two memoranda were written before Geoconsultants prepared the CGA Report. The advisory memorandum states only that EIRs may be required. And although the purported excerpt attached to the memorandum may reflect position of the planning staff in April 2000, concerning the adequacy of recharge through detention ponds, that position was changed in the June 2000 revised draft, which was based on drilling logs and expert specific technical studies and an analysis of recharge rates on the site provided by LandSet and Geoconsultants.
LeMoine's e-mail is also of little probative value. Although he challenged Land-Set's data, he also candidly admitted that he is not a licensed hydrologist or hydrogeologist. Moreover, the record does not reveal his specific qualifications as specialist at the Department of Environmental Health. Furthermore, LeMoine conceded that he was not qualified to evaluate the CGA Report and informed Maki that his views were unofficial and should not be included in the record. Accordingly, his personal views on technical matters beyond his expertise are speculative and not expert opinion based on facts. (See Gentry v. City of Murrieta (1995) 36 Cal. App.4th 1359, 1422, 43 Cal.Rptr.2d 170.)
Viewed together with the specific hydrological and hydrogeological analyses of the Project site and the mitigation system, we do not find that the broad and general statements in memoranda and LeMoine's e-mail constitute substantial evidence that the technical data and analyses about the adequacy of detention/recharge mitigation system may be wrong; or that even with the mitigation system, Project may still pose a significant adverse impact on the groundwater supply.

Adequacy of Water Supply
Landwatch claims there is substantial evidence to support fair argument that the Project does not have an adequate long term water supply. In support of this claim, Landwatch cites undisputed evidence that currently there is a 700 acre-feet overdraft in the Granite Ridge sub-area and the previous moratorium on development. Landwatch notes evidence that the Project will contribute 10.2 acre-fee to the overdraft and cites LeMoine's March 21, 2001 e-mail, in which he thought that demand could be closer to 15 acre-feet. Landwatch again cites the excerpt attached to advisory memorandum, stating *48 that the proposed recharge system "will not reduce cumulative impacts to a level of insignificance."
Again, this evidence must be viewed in light of the whole record. The initial study acknowledges a current annual overdraft of 700 acre-feet in the sub-area. However, the record reflects substantial evidence that the Project is located in the southern part of the sub-area. Moreover, drilling logs for the wells that will supply the Project and testimony before the Planning Commission and Board established that the Project is situated over more alluvial soil, sand, and clay than a thick layer of impermeable granite shelf. Furthermore, unlike the hard-rock, low-yield wells in the northern part of the sub-area, pump tests on the Project's wells revealed much higher yields, stabilized water levels during pump tests, and relatively fast waterlevel recovery after the testing. Given the particular location of the Project and pump tests, the CGA Report opined that there was sufficient water for the Project. Both the Department of Environmental Health and the Water Resources Agency agreed with that conclusion. Last, the technical testing, calculations, and analysis established that recharge from the system of detention ponds would offset the net 10.2 acre-fee of demand.
In our view, general evidence of a sub-area wide overdraft and the prior County-wide moratorium have no tendency to discredit the specific technical analyses and conclusions reached by qualified experts in site-specific studies or the testimony that there is an adequate water supply for the Project. Nor does that general evidence cited by Landwatch reflect an alternative analyses upon which one could reasonably conclude that the existing water supply is inadequate. Finally, for the reasons discussed above, LeMoine's e-mail and the advisory memorandum have little probative value concerning whether the Project has an adequate supply of groundwater. In short, the material cited by Landwatch does not constitute substantial evidence that there may not be an adequate water supply for the Project.
Landwatch challenges the sufficiency of the evidence supporting the conclusion that there is an adequate water supply. It argues that the drilling logs for the two wells serving the Project reveal the presence of some granite at various depths. Landwatch claims the presence of granite shows that the wells are not located in the more porous alluvial materials; rather those wells similar to the hard-rock, low-yield wells in the northern part of the sub-area and will not provide an adequate supply of water.
Landwatch cites no evidence or qualified expert testimony indicating that the drilling logs for the Project's wells reflect the geology of low-yield wells in the northern part of the sub-area. We note that despite the presence of some granite at various depths, the drilling logs reveal that for the vast majority of their depth, the wells are in sand, gravel, clay and mixtures of sand and rock. Furthermore, the drilling logs and presence of some granite were known to the hydrogeological experts and the witnesses from the Environmental Health Department and Water Resources Agency, who nevertheless unanimously concluded that the wells were located in porous soils more associated with the alluvial fan and Highlands South sub-area than with the northern part of Granite Ridge sub-area. That conclusion is further supported by a 1995 survey and review of the Granite Ridge Aquifer System, which explained that the characteristics of the system vary and reflect a transition from solid, unweathered granite, which has no porosity and can hold little water, to granite that has weathered to "a consolidated agglomeration *49 of sand and gravel within a clay matrix," which has greater porosity and stores water in the spaces between the granite, clay, and sand. "The yield of wells completed in the weathered granite are a function of saturated thickness and the permeability of the weathered granite and are usually significantly higher than wells completed in fresh granite."
Thus, the mere fact the Project's wells pass through some granite at some depths, without more, does not support an inference, let alone reasonable argument, that the wells may be hard-rock, low-yield wells that are incapable of providing an adequate supply of water.

Inadequate Mitigation from the Detention Ponds
Landwatch claims that LeMoine's March 21, 2001 e-mail and the letter from Kasunich support fair argument that the proposed recharge system will not mitigate the net demand from the Project. Again, the record does not reflect that LeMoine has training and qualifications in hydrology or hydrogeology or the expertise to evaluate the CGA Report and the percolation data from LandSet or render an qualified expert opinion about the adequacy of recharge from the proposed detention ponds. Moreover, LeMoine's emails do not represent the position of his department, which ultimately supported the Project, and he withdrew his statements from formal consideration.
Kasunich lives near the Project and his experience with water issues provided a motive to oppose all new subdivision development in the area. Kasunich has many years of experience drilling and repairing wells, and most of his letter reflects narrative, anecdotal observations about the groundwater supply, wells, and recharge ponds in other areas. Although "[relevant personal observations of area residents on nontechnical subjects may qualify as substantial evidence for a fair argument" (Pocket Protectors v. City of Sacramento (2004) 124 Cal.App.4th 903, 928, 21 Cal.Rptr.3d 791), Kasunich, like LeMoine, is not a hydrologist or hydrogeologist. Moreover, his letter does not suggest that he evaluated the Project site or the site-specific technical data concerning the wells and recharge system at the Project. Rather, he broadly concludes that recharge ponds are ineffective based on his personal experience of a recharge pond, whose specifications and underlying hydrogeology are unknown.
The lack of pertinent qualifications to evaluate hydrological and hydrogeological issues render LeMoine's and Kasunich's views, and the assumptions behind them, lay speculation on matters that require qualified technical expertise. Consequently, LeMoine's e-mails and Kasunich's letter do not constitute substantial evidence supporting fair argument that the CGA Report and the technical data from LandSet upon which it is based is erroneous or that the proposed system of detention/recharge ponds might not mitigate the 10.2 acre-feet of additional demand generated by the Project. (See Gentry v. City of Murrieta, supra, 36 Cal.App.4th at p. 1422, 43 Cal. Rptr.2d 170; compare National Parks & Conservation Assn. v. County of Riverside (1999) 71 Cal.App.4th 1341, 1362, 84 Cal. Rptr.2d 563 ["an expert can make a judgment on existing evidence, without further study, that a particular condition will have no significant impact"] with Bowman v. City of Berkeley (2004) 122 Cal.App.4th 572, 583, 18 Cal.Rptr.3d 814 [neighbors lay reading of the reports does not constitute substantial evidence supporting fair argument]; see § 21080, subd. (e)(2) ["argument, speculation, unsubstantiated opinion or narrative are not substantial evidence"].)
*50 Citing Architectural Heritage, supra, 122 Cal.App.4th 1095, 19 Cal.Rptr.3d 469, Landwatch claims that LeMoine's emails and Kasunich's letter do constitute substantial evidence.
However, we find reliance on Architectural Heritage to be misplaced. There, the plaintiff challenged the MND adopted by the Monterey County Board of Supervisors concerning the demolition of the old jail in Salinas. (Architectural Heritage, supra, 122 Cal.App.4th at p. 1099, 19 Cal. Rptr.3d 469.) As substantial evidence of fair argument that demolition may cause adverse impacts to an historical resource, the plaintiffs cited the report of an expert in archeological resources management, who opined that the building was historically significant because it was associated with persons important to local and California history, including Cesar Chavez. The plaintiffs also cited similar views expressed by the old jail subcommittee of the Historic Resources Board, the initial study, and various speakers at public hearings. The County argued that the unsubstantiated opinions of non-expert speakers at public hearings did not constitute substantial evidence. (Id. at pp. 1112-1113, 19 Cal.Rptr.3d 4(59.) In rejecting that argument, this court explained that one of the speakers was a certified historian and another was an architect. (Id. at p. 1117, 19 Cal.Rptr.3d 469.) "These and other speakers' remarks represent fact-based observations by people apparently qualified to speak to the question of the jail's historic status. That testimony constitutes substantial evidence, because it consists of 'facts, reasonable: assumptions, and expert opinion supported by facts.' [Citation.]" (Id. at pp. 1117-1118, 19 Cal.Rptr.3d 469.)
Unquestionably, the architect and historian were trained professionals in subjects directly related to whether an old building is an historical resource. Moreover, the speakers' comments were supported by the report from the qualified expert. Furthermore, to the extent that non-experts had significant historical experiences involving or pertinent personal knowledge about the building's history, they too could provide highly relevant information. However, determining the historical significance of an old building is substantially different from calculating the projected water use and net demand from proposed subdivision, the adequacy of the groundwater supply, the percolation rates for various locations on the site, and the capacity of a system of detention ponds to recharge water and offset the projected net demand. Those issues are much more technical and complex and require testing and evaluation by qualified professionals in the fields of hydrology and hydrogeology. Although LeMoine and Kasunich may work in fields that regularly deal with water, wells, and associated environmental issues, neither was professionally qualified to evaluate the tests and studies or render a professional opinion about the studies conducted by the qualified consultants. Moreover, their lay views concerning those studies were not supported by reports or testimony from a qualified expert. Accordingly, LeMoine's e-mails and Kasunich's letter are not comparable to the comments by the architect and historian in Architectural Heritage, supra, 122 Cal.App.4th 1095, 19 Cal. Rptr.3d 469.[11]
Landwatch claims there is substantial evidence that the detention ponds may not recharge the local aquifer hundreds of feet below as fast as the Project uses water and without contamination from other uses and the septic system on the site. In support of this claim, Landwatch cites evidence *51 that (1) generally only 5 to 10 percent of the average annual rainfall of 18 inches recharges through Aromas Sand, and the rest is lost to runoff and evaporation; (2) tests from the Project's septic system revealed moderate to slow percolation; and (3) the recharge pipes are only 10 to 20 feet deep, the wells are around 500 feet deep, and the groundwater level is 226 to 237 feet.
First, evidence concerning the slight amount of water that percolates through undeveloped land over Aromas Sand when it rains and the larger amount lost to runoff and evaporation has no reasonable tendency to undermine or rebut the specific data concerning percolation and recharge rates from detention ponds that are specifically designed to catch and retain runoff, store it, and promote significant amounts of recharge. The relevance of slow percolation from the area around the septic system is unclear because they are located in different areas, presumably where slow percolation ensures protection of the underground waterbasin. On the other hand, the record reveals that the detention ponds are located in the best drainage areas to foster and achieve faster percolation. Moreover, there is no evidence that the septic systems leak into the detention ponds. Last, undisputed evidence concerning the relative depths of the percolation pipes, the water table, the ground water, and the wells does not, by itself, reasonably imply that water from the ponds may not reach the groundwater basin in a timely fashion.
We further note that the selective list of facts cited by Landwatch represents only a small fraction of the relevant information that was considered by Geoconsultants, the Planning Commission, and the Board in determining whether the mitigation system would collect sufficient water in the detention ponds, and recharge enough of it to the aquifer to offset the net water demand. Landwatch is no more qualified than LeMoine or Kasunich to evaluate the hydrology of the Project and offer a competing professional opinion about the adequacy of the recharge system. Its argument here is simply speculation, and without evidence from a qualified person to support Landwatch's inferences and analysis, its list of facts does not support reasonable argument that the detention/recharge system may not recharge the local aquifer fast enough to mitigate the Project's net use of groundwater.

Independent Verification of Test Data
Last, Landwatch claims the MND is invalid because, by its own admission in the initial study, the County did not independently verify the information provided by Geoconsultants and LandSet. Landwatch argues that County violated the fundamental principles of CEQA by delegating to the Chapins and their consultants the responsibility to evaluate the Project's potentially adverse hydrological impacts. In support of this claim, Landwatch cites section 21082.1 and Sundstrom v. County of Mendocino (1988) 202 Cal.App.3d 296, 248 Cal.Rptr. 352.
Reliance on Section 21082.1 is misplaced. Section 21082.1, subdivision (a) requires that a negative declaration be prepared "directly by, or under contract to, a public agency." That requirement does not prohibit an applicant from submitting information in any form and may be considered and included in the record. (§ 21082.1, subd. (b).) The lead agency must, however, "[independently review and analyze" any reports and verify that its decision to adopt a MND is based on its "independent judgment." (§ 21082.1, subds. *52 (c)(l)(c)(3).)[12]
In Friends of La Vina v. County of Los Angeles (1991) 232 Cal.App.3d 1446, 284 Cal.Rptr. 171, disapproved on other grounds in Western States v. Petroleum Assn. (1995) 9 Cal.4th 559, 570, fn. 2, 38 Cal.Rptr.2d 139, 888 P.2d 1268, the county directed the applicant to hire a private consultant to prepare the draft EIR. The county reviewed it, and the consultant revised the draft several times. The county then adopted and released the draft EIR. (Id. at pp. 1450-1451, 284 Cal.Rptr. 171.) The reviewing court held that the procedure did not violate CEQA. "[A]n agency may comply with. CEQA by adopting EIR materials drafted by the applicant's consultant, so long as the agency independently reviews, evaluates, and exercises judgment over that documentation and the issues it raises and addresses." (Id. at p. 1452, 284 Cal.Rptr. 171.)
Here, the Chapins submitted the technical reports from Geoconsultants and Land-Set to the County. The County reviewed and considered them and then prepared the initial study and MND as required by section 21082.1, subdivision (a). CEQA did not require the County to conduct independent, duplicative tests to verify the information submitted by Geoconsultants and LandSet, and Landwatch cites no authority suggesting the County had such a duty. CEQA required only that the County independently analyze and exercise its independent judgment over that information. (§ 21082.1, subds. (c)(1) & (c)(3).) The record amply supports a finding that County personnel from various agencies reviewed and analyzed all of the material submitted with the Chapins' application. Moreover, the ordinance approving the Project and adopting the MND expressly states that staff reviewed the information, studied the potential environmental impacts, and found no substantial evidence to support fair argument that the Project may have significant adverse environmental impacts. The ordinance continues, "The Mitigated Negative Declaration reflects the independent judgment and analysis of the County based upon the findings and conclusions drawn in the Initial Study and the testimony and information received, and scientific and factual data presented as evidence during the public review process."
Landwatch's reliance on Sundstrom v. County of Mendocino, supra, 202 Cal. App.3d 296, 248 Cal.Rptr. 352 is also misplaced. There, the county approved a conditional use permit authorizing the construction of a sewage treatment plant to serve an existing development. Among the conditions of approval was a requirement that the applicant develop and implement *53 concrete mitigation measures sometime after the project was approved. The applicant was also required to prepare a hydrological study that evaluated the project's potential environmental effects and proposed the necessary mitigation measures. On appeal, the court found that the county violated CEQA by approving the project with a negative declaration before it had resolved all of the questions about potentially significant adverse impacts. The court explained that because the success of any mitigation was uncertain, the county improperly adopted an MND, which requires a finding that the project would not have adverse impacts. Moreover, the court opined that deferring environmental assessment until after the project was approved was inconsistent with CEQA's policy of identifying impacts before the momentum of a project interferes with an agency's ability to change its course of action. (Id. at pp. 306-307, 248 Cal.Rptr. 352.) In addition, the court observed that "the conditions improperly delegate[d] the County's legal responsibility to assess environmental impact by directing the applicant himself to conduct the hydrological studies subject to the approval of the planning commission staff." (Id. at p. 307, 248 Cal.Rptr. 352.)
Here, the County did not defer the assessment of potential impacts and the adequacy of mitigation until after the Project was approved. Nor did the County completely delegate to planning staff final responsibility to review and assess the mitigation measures proposed by the Chapins. Rather, the County approved the Project and prepared the MND only after it had independently reviewed and exercised its judgment over the initial study, the information and material submitted by the Chapins, and the testimony of witnesses.

SVWP as Mitigation
Landwatch claims that the Board abused its discretion in listing the SVWP as mitigation because (1) it is not yet built, and (2) there is no evidence that improving the Salinas basin will benefit the long-term water supply in North Monterey County.
First, we note that the studies and analyses of the wells and detention/recharge system standing alone established that the Project has an adequate water supply and will mitigate its net water demand by recharging an equal amount or more. Thus, the Board's reference to the SVWP is additional, but unnecessary, evidence of mitigation.
Next, we note that the CWRM Plan, which was completed after the final initial study and MND were filed, explained that if the SVWP is funded and implemented, "water supply benefits would accrue to portions of North County, particularly Highlands South and Granite Ridge, although no specific capital facilities to distribute, store, or transfer water into those sub-areas are currently included in the SVWP." Nevertheless, the Plan noted that the "Salinas Valley Historical Benefits Analysis (HBA) and recent groundwater modeling demonstrated that higher water levels in the Salinas Valley would help maintain water levels within the Highlands South and Granite Ridge sub-areas."
At the hearing before the Board, Weeks, Director of the Water Resource Agency, testified that the SVWP has new debt funding from a ballot measure (Proposition 218), which requires new projects within a specified zone that will benefit from the SVWP to pay fees and assessments.[13] *54 Weeks testified that the SVWP is nearing implementation; it had almost all of the required state and local permits necessary; consultants would complete design work in 2004; and construction would begin in 2005. He further explained that when implemented the SVWP will protect and increase the Salinas Valley floor water elevation, which increases the level of the groundwater basin, ensuring an increased and sustainable long-term water supply. "Our mission is to protect and preserve that groundwater resourse, and we believe the [SVWP] does that. It gets us our long-term water supply  the Highlands South, the alluvial soils (not the granite soils in Granite Ridge) and the Salinas Basin as a whole."
This information and testimony constitutes substantial evidence to support the Board's finding that the implementation of the SVWP is an additional, albeit unnecessary, source of mitigation of impacts to the long-term water supply. Moreover, because the additional mitigation through the SVWP was not necessary, any alleged defect in citing the SVWP as mitigation is of no consequence and would not undermine the Board's finding of no significant adverse hydrological impacts or the validity of the NMD.

Water Impact Fee as Mitigation
Landwatch similarly claims the Board abused its discretion in listing the water impact fee as mitigation. Landwatch asserts that the water impact fee was enacted solely to fund studies. Relying on Kings County Farm Bureau v. City of Hanford (1990) 221 Cal.App.3d 692, 270 Cal.Rptr. 650 (City of Hanford), Landwatch argues that paying for studies is not mitigation because it does not reduce or rectify the adverse impact of the Project's net water demand.
Courts have found that fee-based mitigation programs for cumulative impacts, based on fair-share infrastructure contributions by individual projects, to constitute adequate mitigation measures under CEQA. (See, e.g., Russ Bldg. Partnership v. City and County of San Francisco (1988) 44 Cal.3d 839, 845, 244 Cal.Rptr. 682, 750 P.2d 324; Anderson First Coalition v. City of Anderson (2005) 130 Cal. App.4th 1173, 1188, 30 Cal.Rptr.3d 738; Save our Peninsula Committee v. Monterey County Bd. of Supervisors (2001) 87 Cal.App.4th 99, 140, 104 Cal.Rptr.2d 326; San Franciscans for Reasonable Growth v. City and County of San Francisco (1989) 209 Cal.App.3d 1502, 1515-1520, 258 Cal.Rptr. 267.)
In Save our Peninsula Committee v. Monterey County Bd. of Supervisors, supra, 87 Cal.App.4th 99, 104 Cal.Rptr.2d 326, this court found substantial evidence to support the county's determination that a traffic impact fee would mitigate traffic congestion because the fees would pay for "improvements to be constructed as the traffic triggering the need for the improvements exceeded a projected threshold and the funds to pay for the improvements were generated by the new development." (Id. at p. 141, 104 Cal.Rptr.2d 326, italics added.) We explained that CEQA required not "a time-specific schedule for the County to complete specified road improvements" but only "a reasonable plan for mitigation" that the relevant agency commits itself to implementing. (Ibid.) Citing City of Hanford, supra, 221 Cal. App.3d 692, 270 Cal.Rptr. 650, on which Landwatch relies, we acknowledged that "a commitment to pay fees without any evidence that mitigation will actually occur is inadequate." (Save our Peninsula Committee v. Monterey County Bd. of Supervisors, supra, 87 Cal.App.4th at p. 140, 104 Cal.Rptr.2d 326.) However, we concluded *55 eluded that the traffic fee was not part of an idle or empty of mitigation.
In City of Hanford, the city found that certain impacts on groundwater were rendered insignificant because of a "mitigation agreement" with the water district, under which the project applicant agreed to pay fees to be used to purchase water supplies and make up for amounts used by the project. However, the record contained no evidence indicating that any such water supplies were or would be available. Consequently, the applicant's promise to pay the fees bore no connection to actual mitigation of impacts. The court found that the EIR was inadequate in this respect. (City of Hanford, supra, 221 Cal.App.3d at pp. 727-728, 270 Cal.Rptr. 650.)
We again find City of Hanford to be distinguishable. There, the "mitigation agreement" and the fees that the applicant promised to pay were not linked to any actual plan to purchase water or make infrastructure improvements that would mitigate cumulative adverse hydrological impacts. The fees simply constituted money in the bank. Here, the record shows that the fee is linked to an actual and reasonable plan for mitigation. Landwatch correctly notes that the water impact fee was enacted to pay studies. However, it was also enacted to pay for "investigations, plans, and programs," including hydrogeological evaluation; groundwater management plans; groundwater monitoring locations; and developing, testing, and applying a water data management system. (Monterey County Code, § 18.51.070.)
The water impact fees funded the CWRM Plan. As Lawrence testified, however, once the CWRM Plan was completed, the water impact fees were being applied to implement the SVWP. (See Gentry v. City of Murrieta, supra, 36 Cal.App.4th at p. 1380, 43 Cal.Rptr.2d 170 [factual testimony of agency staff based on personal knowledge is substantial evidence].) As noted, the SVWP includes infrastructure projects designed to improve the quality and quantity of the water supply in the Salinas basin. Moreover, the CWRM Plan, the Salinas Valley Historical Benefits Analysis, and Weeks all concluded that the implementation of the SVWP would benefit the Highlands South and Granite Ridge sub-areas within the designated zone.
Under the circumstances, substantial evidence to supports the Board's conclusion that the water impact fee provides an additional form of mitigation, in that the SVWP will help enhance, protect, and maintain the long-term water supply of areas connected to the Salinas basin, including the southern portion of Granite Ridge. (See Guidelines, § 15370.)[14]
Furthermore, we again conclude that any alleged defect in listing the impact fee as mitigation would not undermine the Board's finding concerning the lack of adverse impacts or the validity of the NMD because the record establishes sufficient mitigation without the SVWP and the water impact fee, and there is no substantial evidence to support fair argument that the Project will have significant adverse impacts.

Consistency with General Plan, North County Area Plan, and County Code
Landwatch contends that the Project violates the General Plan and the North County Area Plan.
*56 "When we review an agency's decision for consistency with its own general plan, we naturally accord great deference to the authoring agency's determination. [Citation.] The agency has broad discretion, especially regarding general plan policies, which reflect competing interests. [Citation.] `A reviewing court's role "is simply to decide whether the [agency] officials considered the applicable policies and the extent to which the proposed project conforms with those policies."` [Citations.] If the agency's decision is not arbitrary, capricious, unsupported, or procedurally unfair, it is upheld. [Citation.]" (Anderson First Coalition v. City of Anderson (2005) 130 Cal.App.4th 1173, 1192, 30 Cal. Rptr.3d 738, italics in original; San Franciscans Upholding the Downtown. Plan v. City and County of San Francisco (2002) 102 Cal.App.4th 656, 677-678, 125 Cal.Rptr.2d 745; Save our Peninsula Committee v. Monterey County Bd. of Supervisors, supra, 87 Cal.App.4th at p. 141, 104 Cal.Rptr.2d 326.) In other words, we will overturn a local agencies interpretation only if "a reasonable person could not have reached the same conclusion." (No Oil, Inc. v. City of Los Angeles (1987) 196 Cal.App.3d 223, 243, 242 Cal.Rptr. 37.)
As we explained in Save our Peninsula Committee v. Monterey County Bd. of Supervisors, supra, 87 Cal.App.4th at page 142, 104 Cal.Rptr.2d 326, courts defer to the agency's determination of consistency "because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes." [15]
"A `project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment. [Citation.]' [Citation.] Perfect conformity is not required, but a project must be compatible with the objectives and policies of the general plan. [Citation.] A project is inconsistent if it conflicts with a general plan policy that is fundamental, mandatory, and clear. [Citation.]" (Endangered Habitats League, Inc. v. County of Orange (2005) 131 Cal.App.4th 777, 782, 32 Cal.Rptr.3d 177; San Franciscans Upholding the Downtown Plan v. City and County of San Francisco, supra, 102 Cal.App.4th at p. 678, 125 Cal.Rptr.2d 745; see Sequoyah Hills Homeowners Ass'n v. City of Oakland (1993) 23 Cal.App.4th 704, 717, 29 Cal.Rptr.2d 182 ["state law does not require *57 an exact match between a proposed subdivision and the applicable general plan"].)
Given the undisputed general, overdraft in North Monterey County, Landwatch claims the Project violates Policy 53.1.3 of the General Plan, which states, "The County shall not allow water consuming development in areas which do not have proven adequate water supplies." Landwatch argues that approving the Project "will obstruct their attainment, specifically preservation of a long-term water supply."
Policy 53.1.3 is intended "to promote adequate water service for all county needs" (capitalization omitted) in order to "[a]chieve a sustained level of adequate water services." Another goal of the General Plan is "to promote adequate, replenishable water supplies of suitable quality to meet the county's various needs" (capitalization omitted) in order to "[eliminate long-term groundwater overdrafting in the County as soon as practicably possible." To this end, County policy is that "[increased uses of groundwater shall be carefully managed, especially in areas known to have ground water overdrafting."
Numerous studies and pump tests and the testimony before the Planning Commission and Board reasonably support a finding that the Project has a proven and adequate water supply. In addition, the evidence concerning the detention/recharge system reasonably supports a finding that the Project will offset any net water demand and perhaps replace more water than it uses. Thus, notwithstanding the general overdraft, the Board reasonably could find the Project to be fundamentally compatible with both the goal of promoting an adequate and replenishable water supply and the objective of eliminating the overdraft through careful management of groundwater resources and would not obstruct their attainment. Moreover, the Board could reasonably understand the General Plan and its goals, policies, and objectives as guides, rather than compulsory requirements, and treat Policy 53.1.3 as an advisory policy statement rather than a mandatory and absolute bar against the approving new development that uses water, regardless of whether it would have an adverse hydrological impacts. In this regard, we note that when the County intends to impose a moratorium, it has done so directly by ordinance. (See fn. 3, ante.)
Under the circumstances, we do not find that the Board's application of the policy and finding of consistency was arbitrary, capricious, or unsupported by substantial evidence.
Landwatch claims the Project violates Policy 6.1.4(NC) of the North County Area Plan, which states that "[n]ew development shall be phased until a safe, long-term yield of water supply can be demonstrated and maintained. Development levels that generate water demand exceeding safe yields of local aquifers shall only be allowed once additional water supplies are secured."[16] Landwatch argues that the Project generates demand in excess of safe yield, and no additional water supplies have been secured.
The North County Area Plan also provides that "[developments shall be designed to maximize groundwater recharge capabilities and to minimize runoff from the property" and calls for "groundwater management plans" which "identify methods to promote recharge protection, erosion *58 control, drainage management, water quality control, and safe, long-term yields of aquifers." (North County Area Plan, §§ 5.1.3(NC) and 6.1.3(NC).)
Together these policies contemplate new development in the area and attempt to guide it in order to protect groundwater resources.[17] Given the Project's hydrogeological connection to the greater Salinas groundwater basin, the adequacy of its water supply, the capability of the detention/recharge system, and its contribution to implementation of the SVWP, the Board reasonably could deem the Project consistent and compatible with the North County Area plan, in that it was designed to maximize and promote recharge and, with mitigation, would not generate water demand that exceeded the safe yield.
Under the circumstances, we do not find the Board's finding of consistency to be unreasonable, arbitrary, capricious, or unsupported by substantial evidence.

Conclusion
We are mindful that "the EIR is the 'heart of CEQA.' [Citations.]" (Laurel Heights Improvement Assn. v. Regents of University of California, supra, 6 Cal.4th at p. 1123, 26 Cal.Rptr.2d 231, 864 P.2d 502.) The California Supreme Court has explained that "since the preparation of an EIR is the key to environmental protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (No Oil, Inc. v. City of Los Angeles, supra, 13 Cal.3d at p. 75, 118 Cal.Rptr. 34, 529 P.2d 66; see §§ 21080, subd. (d), 21082.2, subd. (d), 21151, subd. (a); Guidelines, § 15064, subd. (f)(1).)
On the other hand, CEQA does not require the generation of unnecessary paperwork in the form of an EIR (see Bozung v. Local Agency Formation Com. (1975) 13 Cal.3d 263, 283, 118 Cal.Rptr. 249, 529 P.2d 1017), and where it cannot be fairly argued on the basis of substantial evidence that a project may have significant adverse impacts, an EIR is unnecessary, and CEQA does not require one.
Such is the case here. In the proceedings before the Planning Commission, the Board, the Superior Court, and now this court, Landwatch has failed to Cite substantial evidence to support fair argument of a significant adverse impact. Moreover, the MND is supported by overwhelming, uncontradicted evidence that the Project has an ample water supply, and, with mitigation, its potentially adverse impacts to the groundwater supply will be rendered insignificant. Accordingly, we conclude that the Board did not violate CEQA in approving the Project with an MND.

Disposition
The judgment is affirmed.
MIHARA and McADAMS, JJ., concur.
NOTES
[1] All further statutory references are to the Public Resources Code unless otherwise specified.

Although CEQA is part of Public Resources Code, the California Code of Regulations, title 14, section 15000 et seq. sets forth administrative guidelines (Guidelines) for implementing CEQA. All references to the Guidelines are to title 14 of the California Code of Regulations.
[2] In the administrative and judicial proceedings below, Landwatch claimed the Project may cause potentially adverse environmental impacts to water supply, aesthetics, biological resources, hazards and hazardous materials, utilities, air quality, and traffic. However, on appeal, Landwatch focuses only on the potential impact to the groundwater supply. Accordingly, our summary of the evidence and discussion also focus on that issue.
[3] Because the application was filed in 1999, it' was exempt from a moratorium on new development adopted by the Board in September 2000. (Monterey County Ordinance No. 4038.) The moratorium was intended to permit the Monterey County Water Resources Agency to complete the Comprehensive Water Resources Management Plan for North County (the CWRM Plan) and consider possible amendments to various land use regulations.
[4] Overdraft is "[a] condition in which the amount of water withdrawn is greater than the amount of recharge." Recharge is "[t]he addition of water to the zone of saturation; also, the amount of water added."
[5] According to the CWRM Plan, 85 percent of the existing overdraft occurs in the Pajaro sub-areas of Springfield Terrace (46%), Pajaro (22%) and Highlands North (17%). The remaining 15 percent occurs in the Salinas sub-areas of Highlands South (10%) and Granite Ridge (5%).
[6] Monterey County Ordinance No. 3496, as amended by Ordinance No. 4005, of the County of Monterey, added Chapter 18.51 to the Monterey County Code. It established a Water Impact Fee of $1,000 per parcel of new subdivision development in North Monterey County. The fee was intended "to assist in financing the study and management plans relating to the safe yield of the North Monterey County aquifers," including preparation of the CWRM Plan. The fee requirement applies only to new developments for which applications filed before January 1, 2001.
[7] The CWRM Plan was completed and issued in January 2002.
[8] In February 2002, the Board extended the north county development moratorium for an additional six months. As noted, however, the Project was exempt.
[9] The Standard Subdivision Commission includes representatives from the Monterey County Department of Planning and Building Inspection, the Department of Public Works, the Parks Department, the Department of Environmental Health, the Water Resources Agency, and the Fire District.
[10] The excerpt is not a quotation from the June 2000 revised draft of the initial study. Nor is it an a quote from the previous April 2000 draft. However, it mirrors the statement in the April that draft that "[t]he proposal to recharge groundwater by injection does not demonstrate that [net 10.2 acre-feet] would be replaced. . . ."
[11] For similar reasons we also find Landwatch's reliance on The Pocket Protectors v. City of Sacramento, supra, (2004) 124 Cal. App.4th 903, 21 Cal.Rptr.3d 791 misplaced.
[12] Section 21082.1 provides, in relevant part, "(a) Any draft environmental impact report, environmental impact report, negative declaration, or mitigated negative declaration prepared pursuant to the requirements of this division shall be prepared directly by, or under contract to, a public agency. [¶] (b) This section is not intended to prohibit, and shall not be construed as prohibiting, any person from submitting information or other comments to the public agency responsible for preparing an environmental impact report, draft environmental impact report, negative declaration, or mitigated negative declaration. The information or other comments may be submitted in any format, shall be considered by the public agency, and may be included, in whole or in part, in any report or declaration, [¶] (c) The lead agency shall do all of the following: [¶] (1) Independently review and analyze any report or declaration required by this division. [¶] (2) Circulate draft documents that reflect its independent judgment, [¶] (3) As part of the adoption of a negative declaration or a mitigated negative declaration, or certification of an environmental impact report, find that the report or declaration reflects the independent judgment of the lead agency."
[13] The areas within the zone of benefit were determined by geological analysis and include those that have alluvial soil that creates a hydrological connection to the Salinas Groundwater Basin. Highlands South and parts of the Granite Ridge sub-areas, including the Project site, are inside the zone of benefit.
[14] Under section 15370 of the CEQA Guidelines, mitigation includes "(c) Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment. [11] (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. [U] (e) Compensating for the impact by replacing or providing substitute resources or environments."
[15] We reject Landwatch's claim that the court does not defer to the agency's determination of consistency because that determination involves statutory interpretation, over which the court exercises independent judgment. Landwatch primarily relies on Yamaha Corp. of America v. State. Bd. of Equalization (1998) 19 Cal.4th 1, 78 Cal.Rptr.2d 1, 960 P.2d 1031 and this court's decision in MHC Operating Limited Partnership v. City of San Jose (2003) 106 Cal.App.4th 204, 130 Cal.Rptr.2d 564. However, neither case involved CEQA or a determination of whether an action on a project was consistent with a general plan. Moreover, in MHC Operating Limited Partnership, we concluded that "[i]n the particular context of rent control ordinances, '[t]he board's interpretation of an ordinance's implementation guidelines is given considerable deference and must be upheld absent evidence the interpretation lacks a reasonable foundation. [Citation.]" (MHC Operating Limited Partnership v. City of San Jose, supra, 106 Cal.App.4th at pp. 219-220, 130 Cal.Rptr.2d 564.)
[16] The Monterey County Code defines "[s]afe yield" as "the amount of water that can be extracted continuously from the basin or hydrologic sub-area without degrading water quality, or damaging the economical extraction of water, or producing unmitigatable adverse environmental impacts." (Monterey County Code, § 19.02.143.)
[17] In this respect, the North County Area Plan supports the Board's implicit conclusion that General Plan Policy 53.1.3 as an advisory statement rather than mandatory bar to all new development.